UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| Conservation Law Foundation, Inc.,<br><br>    Plaintiff,<br><br>    v.<br><br>Chelsea Sandwich LLC<br>and Global Companies LLC,<br><br>    Defendants. | Case No. 1:24-cv-11766-RGS |

**PLAINTIFF CONSERVATION LAW FOUNDATION'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

**INTRODUCTION**

Plaintiff Conservation Law Foundation ("CLF") submits this memorandum of law in opposition to Defendants Chelsea Sandwich LLC and Global Companies LLC's (collectively, "Global's") Renewed Motion to Dismiss (ECF No. 38) and Memorandum of Law (ECF No. 39).

CLF's Amended Complaint seeks to address Global's violations of federally enforceable Clean Water Act ("CWA") Permits at its Chelsea Sandwich and Revere oil terminals on the Chelsea River, including violations of: (1) numeric effluent limits (Count I); (2) narrative effluent limitations (Count II); and (3) monitoring and reporting requirements (Count III). ECF No. 36 ("Am. Compl."). It is undisputed that these violations were ongoing when CLF filed its Complaint in July 2024. Just one month later, prompted by CLF's lawsuit, Global entered into an Administrative Order on Consent with the Environmental Protection Agency ("EPA") concerning a subset of CLF's numeric effluent limitations. ECF No. 16-2 at 68. The Order required the completion of a treatment system at the Chelsea Sandwich Terminal by April 30,

1

2025 and the closure of the Revere Terminal. The Order assessed no statutory penalties, and did not address the violations in Counts II, or III, or over 800 numeric effluent violations in Count I.

CLF's claims for civil penalties are not moot.[1] Under similar circumstances to those here, federal courts have issued civil penalties against defendants. Global has cited no decision, and CLF is aware of none, in which a case was dismissed as moot where the defendant: (1) violated the Clean Water Act at multiple facilities on a waterway, (2) was subject to a consent order without penalties, and (3) continued to operate facilities on the same waterway.

## BACKGROUND[2]

**Global's Operations**

Global operates oil terminals that pollute the Chelsea River. Am. Compl. ¶¶ 3–4. Tanker ships dock at Global's terminals and pump petroleum products into above-ground storage tanks where they are stored until they are transferred to tanker trucks. *Id.* at ¶¶ 74–77, 92–96. Global contaminates local waters when rainwater flows over Global's tanks, docks, and truck-loading areas; when Global remediates polluted groundwater from historic industrial spills; and when it generates wastewater from boiler maintenance and pipe testing. *Id.* at ¶¶ 84–90, 98–104.

Global operates 12 oil terminals along the East Coast.[3] Defendant Global Companies LLC operates seven terminals in New England, including in Bridgeport, Wethersfield, New

---

[1] A ruling on the mootness of CLF's claims for injunctive relief at the Chelsea Sandwich Terminal would be premature. Without a discovery record to know whether injunctive relief would be necessary or appropriate, this Court shouldn't reach the question of mootness. *See infra* at 3-4, 12-14; ECF No. 21 (Opp. to Mot. to Dismiss) at 12-13.

[2] CLF has provided additional materials outside the pleadings to aid in the Court's Rule 12(b)(1) subject matter jurisdiction determination. *Gonzales v. U.S.*, 284 F.3d 281, 288 (1st Cir. 2002).

[3] EPA's Enforcement and Compliance History Online ("ECHO") database lists 12 active oil terminals with Clean Water Act Permits operated by Global Companies LLC and/or Chelsea Sandwich LLC. U.S. EPA, *Quick Search*, ECHO, https://echo.epa.gov/.

Haven,[4] Burlington, and South Portland.[5] Although the Revere Terminal has now closed, Global continues to operate two terminals on the Chelsea River.[6]

**The 2022 Permits**

On September 30, 2022, EPA released final National Pollutant Discharge Elimination System ("NPDES") Permits for the Terminals ("Permits").[7] As soon as the Permits took effect in December 2022, Global began violating their new numeric effluent limits for polycyclic aromatic hydrocarbons ("PAHs"), heavy metals, ammonia, and chlorine, and continued violating unchanged limits for benzene, pH, and total suspended solids. Am. Compl. ¶¶ 6–11, 118–88, 194–236, 240–44, 246–51, 253–59, 261–62, 268–76. Over the next two years, the violations continued at the Chelsea Sandwich and Revere Terminals. *Id*. at ¶¶ 118–88, 194–236, 240–76. At the Chelsea Sandwich Terminal, Global reported an additional 23 violations between July 2024 and April 2025.[8] At the Revere Terminal, Global reported an additional five violations between June 2024 and September 2024 and failed to monitor and report an additional 154 times between July 2024 and October 2024.[9]

The below image taken from EPA's Enforcement and Compliance History Online ("ECHO") Facility Report page for the Chelsea Sandwich Terminal shows that Global's

---

[4] Global Companies LLC's recently-acquired terminal in New Haven is the subject of an ongoing CWA enforcement lawsuit. *CLF v. Gulf Oil Ltd. P'ship*, Docket No. 3:21-cv-00932-SVN (D. Conn. 2023).
[5] *Quick Search, supra* note 3.
[6] Global Partners, *Global Partners LP Completes Acquisition of Four Liquid Energy Terminals from Gulf Oil* (Apr. 9, 2024), https://www.globalp.com/news/global-partners-lp-completes-acquisition-of-four-liquid-energy-terminals-from-gulf-oil/.
[7] U.S. EPA, NPDES PERMIT MA0003280 (2022), https://www3.epa.gov/region1/npdes/chelseacreekfuelterminals/pdfs/2022/2022-chelsea-final-permit.pdf ("2022 Chelsea Permit"); U.S. EPA, NPDES PERMIT MA0000825 (2022), https://www3.epa.gov/region1/npdes/chelseacreekfuelterminals/pdfs/2022/2022-global-final-permit.pdf ("2022 Revere Permit").
[8] EPA, *Detailed Facility Report for Chelsea Sandwich Petroleum Storage Facility (110000311127)*, ECHO, https://echo.epa.gov/detailed-facility-report?fid=110000311127.
[9] EPA, *Detailed Facility Report for Global Petroleum Terminal (110043159961)*, ECHO, https://echo.epa.gov/detailed-facility-report?fid=110043159961&ej_type=sup&ej_compare=US.

excessive violations have continued into April 2025.[10] The record is unclear (and Global's Motion does not state) whether the samples underlying the April 2025 monitoring data submitted to EPA were taken before or after the installation of the Newterra System.

| Statute | Program/Pollutant/Violation Type | | | | QTR 10 | QTR 11 | QTR 12 | QTR 13+ |
|---|---|---|---|---|---|---|---|---|
| | CWA (Source ID: MA0003280) | | | | 04/01-06/30/24 | 07/01-09/30/24 | 10/01-12/31/24 | 01/01-06/06/25 |
| | Facility-Level Status | | | | Significant/Category I Noncompliance | Significant/Category I Noncompliance | Significant/Category I Noncompliance | Violation Identified |
| | Quarterly Noncompliance Report History | | | | Effluent - Monthly Average Limit | Effluent - Non-monthly Average Limit | Effluent - Non-monthly Average Limit | |
| | Pollutant | Disch Point | Mon Loc | Freq | | | | |
| CWA | Benzo[a]anthracene | 001 - A | Effluent Gross | Mthly | | 13% | 28% | 196% |
| CWA | Benzo[a]pyrene | 001 - A | Effluent Gross | Mthly | 36% | | | 206% |
| CWA | Benzo[b]fluoranthene | 001 - A | Effluent Gross | Mthly | 134% | | 36% | 536% |
| CWA | Benzo[k]fluoranthene | 001 - A | Effluent Gross | Mthly | 34% | | | 92% |
| CWA | Chlorine, total residual | 001 - A | Effluent Gross | NMth | | 577% | | |
| CWA | Chrysene | 001 - A | Effluent Gross | Mthly | | | | 43% |
| CWA | Copper, total [as Cu] | 001 - A | Effluent Gross | NMth | 129% | 26% | 59% | 157% |
| CWA | Cyanide, total [as CN] | 001 - A | Effluent Gross | NMth | | | | 40% |
| CWA | Indeno[1,2,3-cd]pyrene | 001 - A | Effluent Gross | Mthly | | | | 19% |

Global's noncompliance was exacerbated by delay and inaction. For over 14 months, Global took no actions besides the copper source investigation. Their Stormwater Pollution Prevention Plans ("SWPPPs") were never updated. And no source investigation—or any other

---

[10] *Facility Report for Chelsea Sandwich Facility*, *supra* note 8 (earlier quarters removed to fit page).

4

actions—were undertaken to address the PAH violations alleged in CLF's Complaint. Am. Compl. at ¶¶ 118–88, 194–236 (alleging 69 PAH violations, compared with 30 copper violations).

**CLF's Notice and Complaint**

After speaking with concerned community members in Chelsea, Revere, and East Boston, CLF met repeatedly with EPA enforcement staff from January through October 2024 to discuss the pollution and noncompliance at the Chelsea Sandwich and Revere Terminals. ECF No. 21-1 (Govern Decl.) at ¶¶ 3–6. EPA indicated that it did not intend to bring an enforcement action against Global, nor did EPA issue any Notices of Violation or respond in writing to Global's letters. *Id.*

CLF sent a Notice of Intent to Sue to Global on May 9, 2024. Am. Compl. ¶ 15. The Notice alleged 97 self-reported numeric effluent limit violations at the Terminals during the 5-year statutory period. ECF No. 1-1 ("Notice") at 9-12. The Notice also alleged violations of water quality and narrative effluent limits relating to oil, grease, and petrochemicals that produce a visible film, as well as more than 600 monitoring and reporting violations. *Id.* at 12–16.

CLF filed suit on July 9, 2024. Am. Compl. at 2. The Complaint alleges the 97 numeric effluent limit violations alleged in the Notice, as well as six violations reported by Global at the Chelsea Sandwich Terminal during the Notice period (between May 9 and July 9, 2024). ECF No. 1 ("Compl.") ¶¶ 114–238.[11] CLF's Complaint included violations not covered by the Administrative Order, including: (1) certain numeric effluent limit claims in Count I (the January 2023 pH violation and the six violations reported between May and July 2024 at the Chelsea Sandwich Terminal); (2) the Massachusetts water quality standards claims in Count II; (3) the

---

[11] The six more-recent violations include three PAH violations from April 2024 (Compl. at ¶¶ 115-17) and one copper violation and two zinc violations from April and May 2024 (*Id.* at ¶¶ 171-73).

5

narrative effluent limit claims in Count III; and (4) the monitoring and reporting claims in Count IV. *Id.* at ¶¶ 381–424.

On May 15, 2025, CLF amended the Complaint following its negotiated Joint Statement, ECF No. 33, and pursuant to ECF No. 34 (Order). The Amended Complaint includes additional numeric effluent limit violations[12] and omits certain claims related to water quality standard violations and effluent quality. ECF No. 36 (Am. Compl.).

The total monitoring and reporting violations alleged by CLF in the Complaint and Amended Complaint number around 1078. Global claims that 278 of the monitoring and reporting violations can be excused by conditions at the Revere Facility, including redirection of stormwater flow for the June 1, 2023 monitoring period (31 violations), intermittent operation (64 violations), conditions not requiring sampling (183 violations), and no discharge[13] (38 violations). ECF No. 38-2 (Henderson Decl.) at ¶¶ 8–11. However, that leaves 801 monitoring and reporting violations at the Revere Facility which Global cannot explain away, including: 14 failures to report due to "laboratory error or invalid test," Am. Compl. at ¶¶ 298–312; 279 failures to conduct and/or properly report required pollutant scans, *Id.* at ¶¶ 328–39; failure to perform PAH analysis on Chelsea Creek, *Id.* at ¶ 334; 449 failures to report required effluent grab samples from September 2023 to October 2024,[14] *Id.* at ¶ 340; failure to monitor and report

---

[12] The 30 additional numeric effluent violations in the Amended Complaint included 19 PAH violations from June 2024-March 2025 (Am. Compl. at ¶¶ 118-33; 156-60), 8 heavy metals violations from July 2024 through March 2025 (*Id.* at ¶¶ 194-200; 220-22), one ammonia violation from October 2024 (*Id.* at ¶¶ 243-44), and two chlorine violations from September 2024 (*Id.* at ¶¶ 253-56).

[13] Global has no evidence to back up the claim that there was no stormwater discharge from Outfall 001 at the Revere Facility in September 2022—a month when it rained 2.6 inches. Nat'l Weather Service, *NOAA Online Weather Data for Boston Logan Airport in September 2022*, www.weather.gov/wrh/Climate?wfo=box (last visited June 11, 2025). Fact and expert discovery will enable the Parties to further develop these facts.

[14] Global offers evidence regarding the redirection of stormwater from Outfall 001 to Outfall 002 during the "June 1, 2023 monitoring period," but does not speak to the September 2023-October 2024 monitoring and reporting failures. No. 38-2 (Henderson Decl. at ¶ 8).

nine grab samples for methyl tert-butyl ether, total organic carbon, and toxicity (LC50), *Id.* at ¶¶ 341, 342, 347); failure to conduct 25 effluent samples from Outfall 003 in July 2024,[15] *Id.* at ¶ 343; and 24 failures to test for required parameters as part of whole effluent toxicity testing, *Id.* at ¶¶ 348, 350.

Global also does not dispute the facts underlying the 14 monitoring and reporting violations at the Chelsea Facility during the February 2023 monitoring period. CLF alleged that "Global failed to collect, analyze, and/or report at least 14 effluent grab samples" and listed each failure to report in the table at Paragraphs 299–312. As shown in the table below, the 14 failures correspond to 14 separate requirements (seven Average Monthly Effluent Limitations and seven Maximum Daily Effluent Limitations) in the Chelsea Permit. 2022 Chelsea Permit at 4.

| Effluent Characteristic | Effluent Limitation | | Monitoring Requirements[1,2,3] | |
|---|---|---|---|---|
| | Average Monthly | Maximum Daily | Measurement Frequency[4] | Sample Type |
| Benzene[10] | --- | 5 µg/L | 1/Month | Grab |
| Ethylbenzene[10] | --- | Report µg/L | 1/Year[11] | Grab |
| Toluene[10] | --- | Report µg/L | 1/Year[11] | Grab |
| Total Xylenes[10] | --- | Report µg/L | 1/Year[11] | Grab |
| Benzo(a)pyrene[12] | 0.00013 µg/L | Report µg/L | 1/Month | Grab |
| Benzo(a)anthracene[12] | 0.0013 µg/L | Report µg/L | 1/Month | Grab |
| Benzo(b)fluoranthene[12] | 0.0013 µg/L | Report µg/L | 1/Month | Grab |
| Benzo(k)fluoranthene[12] | 0.013 µg/L | Report µg/L | 1/Month | Grab |
| Chrysene[12] | 0.13 µg/L | Report µg/L | 1/Month | Grab |
| Dibenzo(a,h)anthracene[12] | 0.00013 µg/L | Report µg/L | 1/Month | Grab |
| Indeno(1,2,3-cd)pyrene[12] | 0.0013 µg/L | Report µg/L | 1/Month | Grab |
| Naphthalene | --- | 20 µg/L | 1/Month | Grab |

---

[15] The Henderson Declaration addresses certain months of monitoring and reporting violations from Outfall 003, but not the July 2024 violations. ECF No. 38-2 (Henderson Decl. at ¶ 9).

Global erroneously argues that one sample collected on one day for 14 requirements somehow should be considered as one violation. ECF No. 39 (Mem. of Law) at 7, 13. This is wrong. See *infra* at Section IV for cases undermining such a proposition.

**The Administrative Order**

The Administrative Order was entered on August 19, 2024, requiring Global to design and install a new treatment system at the Chelsea Sandwich Terminal in order "to meet the metals and PAH effluent limits in the Chelsea Sandwich NPDES Permit." ECF No. 16-2 at 71. Pilot testing of the new system was conducted for only copper and zinc—not for any PAHs or other pollutants. *Id*. The Order does not include plans for Global to cease violations of its numeric limits for chlorine (exceeded in 2024), nitrogen (exceeded twice in 2023), pH (exceeded in 2023), and total suspended solids (exceeded twice in 2023). *Supra* note 8; Am. Compl. ¶¶ 240–42, 261–62, 268–70.

The Administrative Order does not include provisions to incentivize Global's compliance and eliminate the realistic possibility of future violations. ECF No. 16-2 at 73–74. It imposes no stipulated penalties for failure to conduct and submit required monitoring or for failure to meet the numeric permit limits post-installation. The Order does not specify the "stepped treatment processes" and contains no deadline for their installation, no requirement to obtain EPA and MassDEP approval prior to their implementation, and no penalties for failing to implement them. *Id.* There is not even a requirement that Global undertake further corrective action should the initial step fail. *Id.* The Order has no teeth.

**Recent Sampling Results**

Global conducted early testing of the Newterra System on five occasions in April and May of 2025. ECF No. 38-2 at ¶¶ 12–16. Though Global states that "all effluent parameters

covered under the Chelsea Permit and the Order measured as either non-detect or under the Chelsea Permit limits," ECF No. 39 at 8–9, it is too early to tell if the system will ensure compliance when weather and operational conditions change.

Long-term effective treatment requires not just a system capable of treating the discharge on its best day, but also frequent and methodical cleaning and maintenance of that system over time to keep it working as intended.[16] Cleaning and maintenance concerns are particularly salient as CLF has alleged that Global has been failing to comply with the Permits' requirements relating to control measures, Best Management Practices, and Stormwater Pollution Prevention Plans. Am. Compl. at ¶¶ 285–86, 292–93, 397–400.

Furthermore, one month of compliance does not mean the Facility will continue to achieve compliance going forward. Even before the installation of the Newterra System, Global periodically experienced months without any violations, only to subsequently fall back into its pattern of noncompliance.[17] And it is impossible to tell from the data provided by Global how close the measured PAH values are to the detection level and violations of the numeric limits. The PAHs monitoring values are reported by Global as not detected at the reporting limit ("ND") with no actual measured values provided. *See e.g.* ECF No. 38-2 at 13.  Because the minimum detection limit for PAHs (the reporting limit or "RL" value of 0.048 ug/L) is significantly higher than the numeric effluent limits in the permit (between 0.00013–0.013 ug/L, depending on the pollutant), any value above the above the detection limit is a per se violation.

---

[16] EPA, *NPDES Permit No. MA0003280 2020 Fact Sheet* at 9, www.epa.gov/sites/default/files/2021-02/documents/draftma0003280permit.pdf ("Improper operation and maintenance may result in non-compliance with permit effluent limitations.").

[17] The Chelsea Sandwich Terminal was in compliance with all of its numeric effluent limits in December 2022, April 2023, and November and December 2024. *Facility Report for Chelsea Sandwich Facility*, *supra* note 8.

## ARGUMENT

I.   **The Action Is Not Precluded by the Administrative Order.**

CLF begins by clarifying that its claims are not precluded by statute. This case involves neither a prior-commenced government civil penalty action under 33 U.S.C. § 1319(g)(6), nor a diligent government prosecution commenced before the end of the 60-day notice period under 33 U.S.C. § 1365(b)(1)(B). Under 33 U.S.C. § 1319(g)(6)(B)(i), a citizen plaintiff may proceed if its citizen suit "has been filed prior to commencement of" the government's "action."

In fact, a citizen suit may proceed even when filed *after* a government action begins. *Blackstone Headwaters Coal., Inc. v. Gallo Builders, Inc.*, 32 F. 4th 99, 110 (1st Cir. 2022). *Gallo Builders* stands for two important premises: 1) citizen claims for civil penalties are precluded only by government actions that assess a civil penalty, and 2) a government action that assesses a civil penalty does not preclude a citizen claim for injunctive relief. *Id*. at 101. This is because "the citizen suit is meant to supplement . . . governmental action." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987). Which is exactly what is happening here. CLF is supplementing EPA's Administrative Order to provide the teeth that the Order lacks. And EPA (an agency suffering from extraordinary budgetary and resource limitations in recent years) was well aware that CLF was filing a lawsuit against Global that requested penalty relief. ECF No. 21-1 (Govern Decl.) at ¶¶ 3–7.

II.   **The Administrative Order Does Not Moot CLF's Claims for Civil Penalties.**

The mandatory language in the CWA requires that civil penalties be imposed—even where violations have stopped post-complaint. Under 33 U.S.C. § 1319(d), "[a]ny person who violates [sections and permits under the CWA] *shall* be subject to a civil penalty" (emphasis added). Because civil penalty liability attaches at the moment of violation, "a suit seeking

10

penalties is intrinsically incapable of being rendered moot by the polluter's corrective actions." *Gwaltney II*, 890 F.2d at 696; *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1153 (9th Cir. 2000) ("liability for civil penalties under the Clean Water Act attaches at the time the violations occur"); *Nat. Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493, 503–04 (3d Cir. 1993) ("once a citizen plaintiff establishes an ongoing violation . . . at the time the complaint is filed, the court is obliged to assess penalties"); *see also Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, No. CIV.A. 01-99-ART, 2009 WL 8520576, at *10 (E.D. Ky. Feb. 27, 2009) (Once a defendant has violated its NPDES permit, "there can be no doubt that [it] is liable for civil penalties."). Global has no answer to these cases—which is why its memorandum does not address them at all.

And even where violations post-complaint have actually ceased due to a government consent order, claims for civil penalties for past violations are not moot. *Borough of Upper Saddle River, N.J. v. Rockland Cnty. Sewer Dist. #1*, 16 F. Supp. 3d 294, 325–26 (S.D.N.Y. 2014) (*citing to Atl. States Legal Found., Inc. v. Pan Am. Tanning Corp.*, 993 F.2d 1017, 1019–22 (2d Cir. 1993)) ("[E]ven if the defendant comes into compliance with a consent order after the initiation of a citizen-suit, and even if there is no prospect of continuing violations, the citizen-plaintiffs' action will only be moot with respect to *injunctive* relief."). The claims for civil penalties survived in both *Rockland Cnty* and *Pan Am*. *Rockland Cnty.* 16 F. Supp. 3d at 327; *Pan Am.*, 993 F.2d at 1022.

Other federal courts also order civil penalties in similar circumstances. *Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1135 (11th Cir. 1990) ("[T]he mooting of injunctive relief will not moot the request for civil penalties as long as such penalties were rightfully sought *at the time the suit was filed*.") (emphasis added); *Chesapeake Bay Found., Inc.*

*v. Gwaltney*, 890 F.2d 690, 696 (4th Cir. 1989) ("*Gwaltney II*") (allowing "civil penalties assessed for past acts" even after the defendant has come into compliance because the "penalty factor keeps the controversy alive"); *Cooper v. Toledo Area Sanitary Dist.*, No. 3:16-CV-1698, 2021 WL 5448764, at *3–4 (N.D. Ohio Nov. 22, 2021) (Defendants' adoption of required plan does not moot request for civil penalties).

  Additionally, the Supreme Court has held that the citizen's claim remains live so long as the imposition of a civil penalty may deter future misconduct. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). A close reading of *Laidlaw* reveals that the key inquiry when assessing whether civil penalties were moot was deterrence, rather than whether the violations were expected to recur. *Laidlaw*, 528 U.S. at 174, 185 (rejecting argument that claims for civil penalties against operators of a permanently dismantled facility were moot, as civil penalties further the goals of the Clean Water Act by "deter[ring] future violations"); *Nat. Res. Council of Maine v. Int'l Paper Co.*, 424 F. Supp. 2d 235, 257 (D. Me. 2006) (The "critical question under *Laidlaw*" is not whether the violations are likely to recur at a given facility, but whether polluter's conduct "justifies the imposition of civil penalties to deter future conduct.").[18] The deterrence analysis is defendant-focused rather than facility-focused: "a defendant once hit in its pocketbook will surely think twice before polluting again." *Laidlaw*, 528 U.S. at 186. Deterrence through civil penalties keeps a dispute live even when future violations by the defendant *from the facility at issue* would be impossible. *Id.* at 179, 185.

  By only focusing on whether violations are expected to recur, Global overlooks the facts of the *Laidlaw* case and ignores the Supreme Court's emphasis on deterrence. But even if this

---

[18] Under the same principle, even issuance of a new and different permit will not moot civil penalty claims for violations of a previous permit. *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1153 (9th Cir. 2000) ("[C]ivil penalties deter future violations of the Clean Water Act even when injunctive relief is inappropriate" due to issuance of new permit.).

Court entertains Global's reading of *Laidlaw*, Global has not made it "absolutely clear that [its] CWA violations] could not reasonably be expected to recur." *Id.* at 189 (quoting *United States* v. *Concentrated Phosphate Export Assn., Inc.,* 393 U.S. 199, 203 (1968)).

      Five sampling results performed less than two months after the novel Newterra System was installed do not make it "absolutely clear" that there is no reasonable possibility of future violations. First, a month of compliance, if that is what has happened, hardly shows that years of noncompliance are conclusively solved. CLF has had no opportunity to inquire into the sampling events or the April 2025 numeric effluent violation reported on ECHO; discovery is needed to determine whether post-Administrative Order violations have in fact occurred. Such determinations are appropriate at a later stage in the litigation. Second, the system only treats a subset of the pollutants at issue. Third, this system will have to be properly maintained, monitored, and operated in order for it to work over the long term. It may require upgrades and modifications. It will require precisely the kind of close monitoring that Global failed to perform, for years, just upstream at the former Revere site. And finally, even if the Newterra System were to resolve the effluent violations, it cannot resolve the monitoring and reporting violations. *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 543–44 (6th Cir. 2004) (lack of *discharge* violations "tells nothing about the likelihood that the defendant's violations of the *monitoring* or *reporting* requirements of the discharge permit would recur.") (emphasis in original).

      If this case is dismissed based on one month of the system's operation, there is no guarantee that six months from now, when the system requires modifications, the company will spend money to make those modifications. Recall that Global never took real action to come into compliance until CLF filed suit. But if penalties are assessed for previous failures, the company

is much more likely to focus and spend money on continued compliance. The imposition of the penalties will apply a vital deterrent effect on Global's continued operations. The dispute remains live, and the claim is not moot.

Global cites to no First Circuit authority for its mootness argument. The First Circuit recently held that citizen claims for injunction are not precluded by government actions that assess a civil penalty but grant no injunctive relief. *Gallo Builders*, 32 F.4th at 101, 110. While the decision does not address mootness (a jurisdictional concept), plainly the Court of Appeals believed that it *had* jurisdiction—that is, that the dispute was not moot merely because prior government action had been taken.

Global's authorities are distinguishable. In *Comfort Lakes,* the citizen plaintiffs' claims for civil penalties were not mooted — but precluded by the state's civil penalty action under 33 U.S.C. § 1319(g)(6). *Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351, 356–57 (8th Cir. 1998). In *City of Dallas*, claims for civil penalties were dismissed as moot in large part because "the consent decree imposed $800,000 in civil penalties on the City." *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 530 (5th Cir. 2008). In *Eastman Kodak*, the Court held an action for civil penalties moot after the defendant had paid a $1 million civil penalty and a $1 million criminal penalty. *Atl. States Legal Found., Inc. v. Eastman Kodak Co.*, 933 F.2d 124, 126–27 (2d Cir. 1991). After *Eastman Kodak*, the Second Circuit held claims for civil penalties not moot despite a prior government assessment of modest fines. *Pan Am. Tanning*, 993 F.2d at 1022. The *Pan Am* decision limited the holding in *Eastman Kodak* to its specific facts. *Id.* ("[T]he panel's attention in *Kodak* was obviously focused on the state's enforcement action, which . . . had extracted $2 million from Kodak. . . . Those facts are not present here.").

14

### III. CLF's Claims for Civil Penalties that Arose at the Closed Revere Facility Are Not Moot.

The closing of Revere Terminal does not moot the claims for civil penalties for past violations at that terminal. As explained in *Laidlaw* and its progeny, the deterrent effect of civil penalties acts on corporate defendants, not inanimate facilities.

Global's reference to *Naples* is inapposite. ECF No. 39 at 14–15. *Naples* related solely to the unpermitted discharge of pollutants, rather than "allegations that the defendant violated an existing NPDES permit, but later came into compliance." *Coastal Env't Rts. Found. v. Naples Rest. Grp., LLC,* 115 F.4th 1217, 1226 (9th Cir. 2024). In addition, the defendant in *Naples* violated the Clean Water Act *only once*. *Id.* at 1220. Courts reviewing facts similar to those here (where there are multiple violations of an existing permit) distinguished *Naples on precisely that ground*. *See* Order on Mot. to Dismiss at 22–23, *Waste Action Project v. Girard Res. & Recycling LLC,* CASE NO. 2:21-cv-00443-RAJ-GJL, (W.D. Wash. June 2, 2025) (No. 195) ("*GRR*") (attached hereto as Exhibit 1).

*GRR* is instructive. There, the defendant discharged industrial stormwater to navigable waters in violation of the terms and conditions of its NPDES permit. *Id.* at 3–4. Despite the fact that the defendant no longer leased or operated the facility, the court stated: "[a] sale or abandonment of a property where a CWA violation previously occurred does not make it 'absolutely clear' that violations will not reoccur and render a case moot." *Id.* at 20 (*citing San Francisco BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1157 (9th Cir. 2002)). "When evaluating mootness, courts may consider whether a defendant operates other facilities with similar operations as the polluting facility, such that the civil penalties will have a deterrent effect." *Id.* (*citing Wild Fish Conservancy v. Cooke Aquaculture Pac. LLC*, No. 17-cv-1708, 2019 WL 6310660, at *13 (W.D. Wash. Nov. 25, 2019)) (holding that civil penalties still serve to deter

15

future Clean Water Act violations where the facility was dismantled and the defendants' permits were terminated).

In *Tosco*, civil penalties against the defendant were needed despite the sale of the facility to "demonstrate to . . . any future owner that violations at this same facility will be costly." 309 F.3d 1153 at 1160. And the court recognized that "[a]llowing polluters to escape liability for civil penalties for their past violations" by selling their polluting assets or vacating a polluting facility "would undermine the enforcement mechanisms established by the Clean Water Act." *Id.*

In *Mirant Lovett*, claims for civil penalties were not moot following facility closure and dismantlement. *Riverkeeper, Inc. v. Mirant Lovett, LLC*, 675 F. Supp. 2d 337, 347–48 (S.D.N.Y. 2009) (dismissed on unrelated grounds). Even when facility changes stopped all discharges into the receiving waters at issue, the claims for civil penalties survived. *Tamaska v. City of Bluff City, Tenn.*, 26 F. App'x 482, 485–86 (6th Cir. 2002); *P.R. Campers' Ass'n v. P.R. Aqueduct & Sewer Auth.*, 219 F. Supp. 2d 201, 220 (D.P.R. 2002).

Here, with its long track record of environmental noncompliance, Global continues to operate. Two of its terminals discharge to the Chelsea River: the Chelsea Sandwich Terminal and the recently purchased terminal on Eastern Avenue in Chelsea. *See supra* note 6. All involve similar operations, similar pollution risks, and similar business incentives. *See supra* at 2–3. In fact, Global took action to achieve compliance only when the company received CLF's notice of intent to sue and the possibility of a penalty arose. Because the continued health of the Chelsea River remains at issue, penalties to ensure longer term environmental compliance are vital. They are the deterrent remedy that Congress ordered.

## IV.    The Monitoring and Reporting Violations Alleged by CLF Should Not Be Dismissed.

Global argues that disputes about its monitoring and reporting failures at the Revere Terminal are moot because Revere has closed. But monitoring and reporting are features of

16

operation, and Global continues to operate just across Chelsea Creek. The deterrence principle acts on Global, not on a particular terminal, and Global's track record is astonishingly bad. CLF has alleged around 1090 separate monitoring and reporting violations at both Terminals—none of which were mentioned in EPA's Administrative Order with Global. While Global has provided an explanation for 278 of these monitoring and reporting violations, it cannot explain away the remaining 813. *See supra* at 6–7. The same company that routinely failed to monitor and report at Revere through the filing of the original complaint in July 2025 is now operating across the river. Disputes about its failure to monitor and report are as live as ever.

As to recent history at Chelsea, during the period when Global has been laboring to convince the Court to dismiss this case, Global misstates the record. It refers to its failure to collect, analyze, and/or report daily and monthly average monitoring data for seven parameters during the February 2023 monitoring period at the Chelsea Facility as a single violation. ECF No. 39 at 13; Am. Compl. at ¶¶ 298–312. Those failures in fact constitute 14 separate violations. The 2022 Chelsea Permit lists the reporting requirements for 14 concentrations in 14 separate boxes—it does not group them together as one sampling/monitoring requirement. *See supra* at 7–8. Also, allowing a permittee to avoid liability for multiple violations by simply using one grab sample on one day to test for all its pollutants would be contrary to the purposes of the Clean Water Act.

The Clean Water Act is clear in 33 U.S.C. § 1319(d) that "[a]ny person who violates any permit condition or limitation . . . *shall* be subject to a civil penalty . . . per day for *each violation* . . ." (emphasis added). Multiple violations of the same NPDES permit provision that occur simultaneously are each separate violations. Courts have upheld treating all violations associated with one bad sample as separate violations—even when multiple limits were violated. *Pub.*

*Interest Research Grp. v. Powell Duffryn Terminals*, 913 F.2d 64, 78 (3d Cir. 1990) (affirming that one effluent sample can violate multiple limits and count as multiple violations, noting that the defendant "could have taken measures to clean up its discharge and taken more samples"); *United States v. Smithfield Foods, Inc.*, 191 F.3d 516, 527 (4th Cir. 1999) (affirming that "different pollutants and their daily maximum and monthly average loading limits are separate requirements listed in the Permit and therefore represent distinct violations").

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion to Dismiss in its entirety.

Dated: June 12, 2025                                    Respectfully submitted,

 /s/ *Heather A. Govern* (BBO #688482)
(617) 850-1765
hgovern@clf.org
Chelsea E. Kendall (BBO #705513)
(617) 850-1792
ckendall@clf.org
Sabin Willett (BBO #542519)
swillett@clf.org
Conservation Law Foundation, Inc.
62 Summer Street
Boston, MA 02110

ATTORNEYS FOR PLAINTIFF
CONSERVATION LAW FOUNDATION, INC.

## **CERTIFICATE OF SERVICE**

      I hereby certify that on June 12, 2025, the foregoing document was filed through the ECF system, by which means a copy of the filing will be sent electronically to all parties registered with the ECF system.

                                                   */s/ Heather A. Govern*
                                                     Heather A. Govern